# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| BRUCE NORVELL , | Case No.: 1:16-cv-00195-BLW-REB |
| Plaintiff, | **REPORT AND RECOMMENDATION RE:** |
| vs. | |
| BLUE CROSS AND BLUE SHIELD ASSOCIATION, *et al.*, | **DEFENDANTS BLUE CROSS OF IDAHO HEALTH SERVICE INC., BLUE CROSS AND BLUE SHIELD ASSOCIATION, AND SPECIAL AGENT MUTUAL BENEFIT ASSOCIATION'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT** |
| Defendants. | **(Docket No. 116)** |
| | **DEFENDANTS CLAIMS ADMINISTRATION CORPORATION AND FIRST HEALTH LIFE AND HEALTH INSURANCE COMPANY'S MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT** |
| | **(Docket No. 117)** |
| | **FEDERAL DEFENDANTS' MOTION TO DISMISS** |
| | **(Docket No. 121)** |
| | **CIGNA HEALTH AND LIFE INSURANCE COMPANY'S MOTION TO DISMISS** |
| | **(Docket No. 127)** |

**REPORT AND RECOMMENDATION - 1**

Pending before the Court are (1) Defendants Blue Cross of Idaho Health Service Inc. ("BCI"), Blue Cross and Blue Shield Association ("BCBSA"), and Special Agent Mutual Benefit Association's ("SAMBA") (collectively "Blue Cross") Motion to Dismiss Plaintiff's Amended Complaint (Dkt. 116); (2) Defendants Claim Administration Corporation ("CAC") and First Health Life and Health Insurance Company's ("FHLH") Motion to Dismiss Plaintiff's Second Amended Complaint (Dkt. 117); (3) Defendants Office of Personnel Management ("OPM), the Director of OPM, the Department of Health and Human Services ("HHS"), the Secretary of HHS, and the Centers for Medicare & Medicaid Services' ("CMS") (collectively "Federal Defendants") Motion to Dismiss (Dkt. 121); and (4) Cigna Health and Life Insurance Company's ("Cigna") Motion to Dismiss (Dkt. 127).  Having carefully considered the record and oral argument, the Court enters the following Report and Recommendation:

## I.  BACKGROUND

This case involves Plaintiff Bruce Norvell's enrollment in the Blue Cross and Blue Shield Service Benefit Plan – a nationwide health benefits plan created pursuant to the Federal Employees Health Benefits Act ("FEHBA").  FEHBA authorizes the United States Office of Personnel Management ("OPM") to enter into contracts with private entities ("carriers") to offer insurance plans to federal employees, retirees, and their dependents.  The Service Benefit Plan is one such plan and is created by a contract between OPM and BCBSA, the latter of which acts on behalf of local Blue Cross and Blue Shield companies such as BCI that, in turn, administer the Service Benefit Plan with respect to health care services rendered in their individual localities.

## A.    Mr. Norvell's Heart Surgery and Cost Share Dispute

Mr. Norvell's complaints initially stem from his 2013 heart ablation surgery and the resulting cost share under the Service Benefit Plan.  *See* 2/2/17 MDO, pp. 2-3 (Dkt. 52).  He disagreed with the approximately $3,800 cost share, which he believed was based, in part, on the

treatment being incorrectly or ambiguously categorized as an "outpatient" procedure instead of an "inpatient" procedure.  *See id*.  He challenged the cost share through the FEHBA-mandated administrative appeal process, prevailed, and the cost share was reduced to $100.  *See id*.  But that did not end the matter; instead, Mr. Norvell proceeded to bring two actions in this Court.

**B.    *Norvell I*:  Previous Lawsuit and Dismissal of Claims**

In September 2014, Mr. Norvell filed a related lawsuit – *Norvell I* – before this Court. *See generally Norvell v. Office of Pers. Mgmt., et al.*, Case No. 1:14-cv-00421-BLW (D. Idaho 2015); *see also* 2/2/17 MDO, pp. 2-4 (describing *Norvell I* proceedings) (citing *Norvell v. Office of Pers. Mgmt. (Norvell I)*, 2015 WL 5611588 (D. Idaho)).[1]  He argued that a lack of definitions in the FEHBA plans for the terms "inpatient" and "outpatient" violated two separate laws:  (1) an FEHBA provision that requires FEHBA contracts to contain "a detailed statement of benefits" that includes "definitions of benefits as [OPM] considers necessary or desirable" (*see* 5 U.S.C. § 8902(d)); and (2) the Public Health Service Act ("PHSA") § 2715, which requires the use of certain uniform definitions in summary documents describing health plans (*see* 42 U.S.C. § 300gg-15).  *See Norvell I*, 2015 WL 5611588 at *2 (D. Idaho 2015).  Mr. Norvell also alleged that he was injured by the insufficient definitions in five distinct ways, including purportedly being "unable to compare various [FEHBA] policies because their statements or benefits contain ambiguous definitions."  *Id*. at *3.

On September 23, 2015, then-Chief U.S. District Judge B. Lynn Winmill dismissed *Norvell I* for lack of subject matter jurisdiction (lack of standing), holding that "the inability to compare various plans does not constitute an injury in fact" because that "so-called injury is

---

[1]  The defendants in *Norvell I* consisted of the following:  OPM, the Inspector General of OPM, Blue Cross, Government Employees Health Association, Inc., National Association of Letter Carriers, Aetna Health Management, LLC, and American Postal Workers Union Health Plan.  *See generally Norvell I* Am. Compl. (Dkt. 5).

**REPORT AND RECOMMENDATION - 3**

neither concrete nor particularized." *Id.*;[2] *see also id.* at *5 ("Having found that Norvell has

failed to establish that he has suffered an injury in fact fairly traceable to the Defendants'

conduct, which could be redressed by judicial intervention, the Court concludes that Norvell

lacks standing.  As such, this Court lacks jurisdiction to entertain Norvell's Complaint.").

     Mr. Norvell appealed Judge Winmill's dismissal.  In February 2016, the Ninth Circuit

summarily affirmed.  *See Norvell v. Office of Pers. Mgmt.*, Case No. 15-35783, Order (9th Cir.

Feb. 25, 2016).

**C.**     *Norvell II*:  **Present Lawsuit, Dismissal, and Remand**

     Mr. Norvell then initiated *this* lawsuit in May 2016 – *Norvell II* – claiming, again, that

Defendants'[3] failure to include and/or require definitions of "inpatient" and "outpatient" in

FEHBA plans prevents him from (1) making informed decisions, (2) understanding and

comparing health care coverage, and (3) determining benefits and co-payment responsibilities.

*See generally* Compl. (Dkt. 1).  According to Mr. Norvell, "Judge Winmill did not understand

the nature of injury . . . alleged in *Norvell I*" and "[a] fresh look by another judge would best

serve the just determination of this action."  Pl.'s Mot. to Deny Defs.' Request for Reassign., p. 2

(Dkt. 23-1).

---

[2]  In concluding that Mr. Norvell "failed to allege any discernible injury in fact resulting from the mischaracterizations of his 2013 claim as outpatient care," Judge Winmill additionally held that:  (1) his assertion that he was injured when he was overcharged thousands of dollars "ignores the fact that he was ultimately successful in getting his cost share obligation reduced to $100"; (2) "spending hundreds of hours wading through the administrative appeals process is not a judicially cognizable injury sufficient to confer standing"; (3) "the alleged harm that [Mr. Norvell] may experience in having to assist his grandchildren" is "purely hypothetical and not at all imminent" and "cannot constitute an injury in fact"; and (4) Mr. Norvell's "contention that he suffers a continuing injury because he remains vulnerable to a similar situation occurring in the future does not satisfy the injury in fact requirement" because it "epitomizes the type of conjectural harm for which standing is always denied."  *Norvell I*, 2015 WL 5611588 at *3-4.

[3]  The *original* defendants in *Norvell II* were Blue Cross, OPM, the Director of OPM, HHS, and the Secretary of HHS.  *See generally* Compl. (Dkt. 1).

**REPORT AND RECOMMENDATION - 4**

Blue Cross and the Federal Defendants moved to dismiss the action based on standing, ripeness, sovereign immunity, res judicata, and/or collateral estoppel.  *See generally* Fed. Defs.' Mot. to Dismiss (Dkt. 10); Blue Cross's Mot. for JOP and Joinder in Fed. Defs.' Mot. to Dismiss (Dkt. 27).  Alternatively, they submitted that this case must be dismissed for lack of standing for the same reasons articulated by Judge Winmill in *Norvell I*.  *See id.*  On February 2, 2017, the undersigned found that Mr. Norvell's claims were precluded and recommended that the action be dismissed:

> In other words, Judge Winmill's dismissal for lack of standing (and, thus, jurisdiction) in *Norvell I* establishes issue preclusion as to the precise issue of standing/jurisdiction.  At the same time, it does not establish claim preclusion *if* jurisdiction can be shown in a second action (for example, this action – *Norvell II*) on other grounds.  Therefore, if Plaintiff has not cured the basis for his previous dismissal in *Norvell I*, that same basis applies here to likewise warrant the dismissal of Plaintiff's similar claims here, in *Norvell II*. . . . .

> [T]here is little difficulty in concluding that Plaintiff's second foray in this Court is procedurally barred.  *Norvell II* is nearly identical to *Norvell I* – the allegations are the same and, importantly, the alleged injuries are the same.  And, the decision in *Norvell I* has already determined that these allegations fail to establish an injury in fact sufficient to incur standing.  In short, Plaintiff has not cured the jurisdictional defect; simply put, he includes no new facts that would prevent application of *Norvell I's* holding that Plaintiff failed to establish an injury in fact for this latest claim.  Thus, *Norvell I* now bars Plaintiff's claims in this action.

2/2/17 Rpt. and Recomm., pp. 6-8 (Dkt. 52) (citing and quoting *Myles v. Bank of America, Inc.*, 2017 WL 24865, *4 (N.D. Cal. 2017), citing *Coll. Sports Council v. Dep't of Educ.*, 465 F.3d 20, 22 (D.C. Cir. 2006)).  On March 2, 2017, U.S. District Judge Edward J. Lodge agreed, adopted the Report and Recommendation, and formally dismissed *Norvell II*:

> The Court finds the Report correctly characterizes the facts, circumstances, allegations, and claims made in this case as well as those made in the prior case. Plaintiff has again failed to show an injury in fact in this case which leaves him without standing to bring this action.  Moreover, Plaintiff is procedurally barred from relitigating the standing question.  The Complaint in this case makes the same allegations and raises the same claims and injuries as in the prior case which was dismissed for lack of standing.  For the reasons stated in the Report, which this Court adopts in its entirety, the Court finds the Defendants' Motion to Dismiss and

**REPORT AND RECOMMENDATION - 5**

Motion for Judgment on the Pleadings should be granted.   In reaching this conclusion, the Court is mindful of the fact that the Plaintiff is a *pro se* litigant.

3/2/17 Order, p. 4 (Dkt. 56).

Mr. Norvell appealed Judge Lodge's dismissal and, on October 30, 2017, the Ninth

Circuit vacated the Court's judgment and remanded the action for further proceedings:

> The district court dismissed Norvell's action on the alternate grounds of lack of Article III standing and issue preclusion.   However, Norvell alleged that he is unable to predict the medical care that would be covered and to project his copayments, and is therefore unable to understand and compare health benefits plans.   *See* 5 U.S.C. § 8907(a)-(b) (setting forth information that the Office of Personnel Management shall make available to "enable the individual to exercise an informed choice among the types of [health benefits] plans.").   In a case decided after the district court's ruling in this case, *Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1113 (9th Cir. 2017), this court explained that in evaluating plaintiff's claim of harm, the district court must analyze "whether the statutory provisions at issue were established to protect [plaintiff's] concrete interests (as opposed to purely procedural rights), and if so, . . . whether the specific procedural violations alleged . . . actually harm, or present a material risk of harm to, such interests."
>
> In light of this intervening authority, we vacate the judgment and remand for further proceedings.   *See Segal v. Am. Tel. & Tel. Co.*, 606 F.2d 842, 845 (9th Cir. 1979) (noting exception to issue preclusion where "[t]he issue is one of law and . . . a new determination is warranted in order to take account of an intervening change in the applicable legal context" and noting that "[i]ssue preclusion has never been applied to issues of law with the same rigor as issues of fact").

10/30/17 Mem. (Docket No. 61).

Following remand, Mr. Norvell attempted to amend his Complaint approximately three times (Dkts. 66, 79, 81, 97-100).   Several other motions also followed,[4] culminating in a September 10, 2018 Order which, among other things, attempted to "settle the pond" as to Mr. Norvell's operative Complaint, while structuring a briefing protocol to accommodate the Defendants' anticipated challenges to the same.   *See generally* 9/10/18 MDO (Dkt. 104).   This

---

[4]  This included Mr. Norvell's (1) Motion for Order Compelling Federal Defendants' Discovery Response (Dkt. 70), and Federal Defendants' (2) Motion for Protective Order (Dkt. 76), (3) Motion to Dismiss Plaintiff's Fifth Claim for Relief (Dkt. 85), and (4) Motion to Stay Summary Judgment Briefing on the Fifth Claim and Proceedings on the Other Claims (Dkt. 87).

process culminated on September 14, 2018, with the filing of Mr. Norvell's 109-page Amended

Complaint, adding additional defendants[5] and raising 134 claims (though asserting 135 "Claims

for Relief," Mr. Norvell "[i]ntentionally" omitted the "Eleventh Claim for Relief"). *See* Am.

Compl. (Dkt. 105).

**D.      Mr. Norvell's Amended Complaint and the Allegations Against Defendants**

Mr. Norvell fears a repeat of the cost share scenario that followed his 2013 heart ablation

surgery.  Contending that FEHBA-plan hospital care copayments can be drastically higher when

categorized as "outpatient" as opposed to "inpatient," Mr. Norvell describes that, "[w]ithout a

uniform definition for the word that dictates copayments for all [FEHBA plans], [he is] unable to

make an 'informed choice' of the insurance plans available [to him] and . . . [is] unable to

anticipate the copayments of those plans."  Norvell Decl., ¶¶ 5, 8 (Dkt. 105-1).  Mr. Norvell's

Amended Complaint seeks to redress these alleged procedural injuries[6] via the 134 claims for

relief.

Specifically, as against the Federal Defendants (117 total claims), Mr. Norvell (1) argues

that OPM failed to require various FEHBA plans to include certain definitions in their plan

brochures, as allegedly required by 5 U.S.C. §§ 8902(d), 8907(a), and 8907(b), respectively

---

[5]  The *current* defendants in *Norvell II* include Blue Cross, the Federal Defendants, CAC,
FHLH, and Cigna.  *See generally* Am. Compl. (Dkt. 105).  Together, Blue Cross, CAC, FHLH,
and Cigna are referred to as the "Insurers" or the "Non-Federal Defendants" when comparing
Mr. Norvell's claims against them on the whole, with those against the Federal Defendants.

[6]  According to Mr. Norvell, "[t]he harm that I suffered resulting from the ambiguous
terms of my 2013 [Service Benefit Plan] . . . prompted my consideration of other available plans.
I reviewed the 2014-2018 Plan Brochures for all 'Nationwide' FEHBA plans that serve most
FEHBA enrollees and determined (a) that inpatient/outpatient categorization dictates hospital
care copayment amounts for *each of* those FEHBA plans, and (b) *none of these Plan Brochures*
substantively defines 'inpatient.'  *Not one!!*"  Am. Compl., ¶ 39 (Dkt. 105) (emphasis in
original).  Presumably, the referenced "other available plans" include the Mail Handlers Benefit
Plan ("MHBP") for federal postal employees, issued by Defendant FHLH and administered by
Defendant CAC, as well as the SAMBA plan(s) issued by Defendant Cigna.

**REPORT AND RECOMMENDATION - 7**

(Claims for Relief 3-10 and 12-15); (2) challenges HHS's promulgation of the 'uniform glossary" as allegedly required by 45 C.F.R. § 147.200(c)(2)(ii) (Claims for Relief 1-2); (3) argues that OPM wrongfully approved the nationwide plans to participate in the FEHB program as allegedly required by 5 C.F.R. § 890.203(a)(3) (Claim for Relief 16); and (4) challenges the alleged failure by CMS and HHS to levy fines against various entities for their non-compliance with the PHSA under 42 U.S.C. § 300gg-15(f) (Claims for Relief 34-135).  *See generally* Am. Compl., ¶¶ 77-105, 155-309 (Dkt. 105); *see also* Att. 8 to Am. Compl. (Dkt. 105-8) (chart of claims against each Defendant).

As against the Non-Federal Defendants/Insurers (17 total claims – nine against Blue Cross; and two against Cigna, CAC, and FHLH, respectively), Mr. Norvell similarly argues that each violated 45 C.F.R. § 147.200(a)(1)(ii) by failing to include compliant information in the Summary of Benefits and Coverage ("SBC") for their particular FEHBA plans (Claims for Relief 17-33);[7] in turn, he asserts that the Non-Federal Defendants/Insurers are subject to fines and/or civil penalties under 42 U.S.C. §§ 300gg-15(f), 300gg-22, and underlying regulations. *See* Am. Compl., ¶¶ 106-154 (Dkt. 105); *see also* Att. 8 to Am. Compl. (Dkt. 105-8).

Mr. Norvell believes that the Non-Federal Defendants/Insurers are intentionally and willfully colluding to withhold definitions of "inpatient" and "outpatient," so as to increase FEHBA plan copayments and lower the expense of OPM and the plan carriers.  *See* Am. Compl., ¶ 42 (Dkt. 105) ("I allege that the failure of the Nationwide FEHBA plans to substantively define

---

[7]  Though similar claims in this respect, Mr. Norvell attempts to distinguish them between Blue Cross (who issued and administered his Service Benefit Plan he enrolled in) on the one hand, and Cigna, CAC, and FHLH (who issued/administered FEHBA plans that Mr. Novell never enrolled in) on the other hand.  *Compare* First. Am. Compl., ¶ 113 (Dkt. 105) ("Defendant violated and continually violates the mandate of 45 C.F.R. § 147.200(a)(1)(ii) *by failing to provide me* with a complaint SBC for each of the Subject Plans."), *with id*. at ¶ 125 ("Defendant violated and continually violates the mandate of 45 C.F.R. § 147.200(a)(1)(ii) *by failing to include* compliant information in the . . . SBC for each of the Subject Plans.") (emphasis added).

**REPORT AND RECOMMENDATION - 8**

the word 'inpatient' is not a coincidence, but rather collusion.  Collusion to intentionally and *willfully deprive* FEHBA enrollees of information mandated by three federal statutes.  Collusion that enables insurance carriers to bill hospital care as 'outpatient,' thus increasing FEHBA Enrollee Copayments, and lowering the expense of OPM and the plan carriers.").[8]

Mr. Norvell's "Prayer for Relief" contains 53 paragraphs spread across 20 pages.  As a general matter, he seeks declaratory relief (as to the existence of statutory/regulatory violations and that such violations were intentional/willful), with corresponding injunctive relief, civil fines, and penalties.  *See generally id.* at pp. 98-108.

E.    **Defendants' At-Issue Motions to Dismiss**

Each Defendant moves to dismiss Mr. Novell's claims against them, arguing variously (or at least through some combination of arguments) that (1) he lacks standing to raise any of his claims; (2) he has no private right of action; (3) there are no statutory violations under the PHSA or FEHBA; (4) enforcement decisions are committed to agency discretion; and (5) there is no subject matter jurisdiction.

## II.  STATUTORY/REGULATORY SETTING[9]

A.    **The FEHBA**

The FEHBA program provides health benefits coverage to federal employees, annuitants, and their families.  OPM has managed the program since 1959, when it was created to help the

---

[8]  Whether Mr. Norvell requests definitions of only "inpatient" or both "inpatient" and "outpatient" has evolved over time.  Suffice it to say, through this action, he requests definitions of any word that, in his mind, dictates the elements of hospital care coverage.

[9]  The Court largely incorporates the statutory and regulatory templates contained within Blue Cross's and the Federal Defendants' briefing.  *See* Blue Cross's Mem. ISO Mot. to Dismiss, pp. 3-8 (Dkt. 116-1); Fed. Defs.' Mem. ISO Mot. to Dismiss, pp. 2-4 (Dkt. 121-1).  Any discrepancies from those templates reflected within Mr. Norvell's briefing are insignificant for this limited purpose.  *See* Pl.'s Resp. to Non-Fed. Defs' Mot. to Dismiss, pp. 9-13 (Dkt. 136); Pl.'s Resp. to Fed. Defs.' Mot. to Dismiss, pp. 1-6 (Dkt. 144).

**REPORT AND RECOMMENDATION - 9**

federal government recruit and retain employees.  *See, e.g.*, S. Rep. No. 86-468 at 2 (1959).

OPM enters into contracts with carriers, which provide the FEHBA plans.  For example, relevant

to the instant dispute, BCBSA, as contracting agent for local Blue Cross and Blue Shield plans

that administer and underwrite the plan in their geographic areas, is under contract with OPM to

offer the Service Benefit Plan involved here.  *Cf.* 5 U.S.C. § 8903(1).  Five additional carriers

offer other "nationwide plans" that are generally available to all federal employees, annuitants,

and their families.  *Cf.* 5 U.S.C. § 8903(2).  Thus, in total, six carriers offer "nationwide plans"

that are generally available to individuals eligible to participate in the FEHBA program.  *See*

Fed. Defs.' Mem. ISO Mot. to Dismiss, p. 2 n.1 (Dkt. 121-1) (identifying six carriers and six

nationwide health plans as:  (1) BCBSA and Service Benefit Plan; (2) Government Employees

Health Association, Inc. ("GEHA") and GEHA Benefit Plan; (3) National Association of Letter

Carriers ("NALC") and NALC Health Benefit Plan; (4) National Postal Mail Handlers Union

and Mail Handlers Benefit Plan; (5) American Postal Workers Union ("APWU") and APWU

Health Benefit Plan; and (6) SAMBA and SAMBA Health Benefit Plan).

The FEHBA provides that all contracts between a carrier and OPM "shall contain a

detailed statement of benefits offered and shall include such maximums, limitations, exclusions,

and other definitions as [OPM] considers necessary or desirable."  5 U.S.C. § 8902(d).

Accordingly, the contract between OPM and each carrier includes an "appended brochure" that

outlines the medical costs the plan will reimburse.  *See Empire Healthchoice Assur., Inc. v.

McVeigh*, 547 U.S. 677, 684 (2006).  This brochure is referred to here as the "Statement of

Benefits" and, with respect to the Service Benefit Plan that Mr. Norvell enrolled in, exceeds 100

pages.  *See* Ex. 1 to Blue Cross's Mem. ISO Mot. to Dismiss (Dkt. 116-2).

Aside from the FEHBA's provision at 5 U.S.C. § 8902(d) described above, the FEHBA

contains a separate provision that sets forth the information that is to be made available to

**REPORT AND RECOMMENDATION - 10**

individuals who are eligible to enroll in FEHBA plans.  *See* 5 U.S.C. § 8907(a) ("The [OPM] shall make available to each individual eligible to enroll in a health benefits plan . . . such information, in a form acceptable to the [OPM] after consultation with the carrier, as may be necessary to enable the individual to exercise an informed choice among the types of plans described by section 8903 and 8903a of this title.").

**B.    The PHSA**

    1.    PHSA § 2715

The Patient Protection and Affordable Care Act ("ACA") enacted section 2715 of the PHSA (codified at 42 U.S.C. § 300gg-15).  The PHSA's § 2715 created the concept of a "summary of benefits or coverage" ("SBC") which is a short, summary document that can be distributed to health plan applicants and enrollees to inform them about the basics of the coverage offered.  To that end, § 2715(a) requires the Secretary of HHS to "develop standards for use by a group health plan and health insurance issuer offering group or individual health insurance coverage, in compiling and providing to applicants, enrollees, and policyholders or certificate holders a summary of benefits and coverage explanation that accurately describes the benefits and coverage under the applicable plan or coverage."  42 U.S.C. § 300gg-15(a).[10]

Among other things, the Secretary of HHS must develop "standards for the definitions of terms used in health insurance coverage," *id*. at § 300g-15(g)(1), and such definitions must be included in SBCs, *id*. at § 300gg-15(b)(3)(A).  The PHSA identifies certain "insurance-related" and "medical" terms that must be included in the standard definitions, including the term

---

[10]    On February 14, 2012, the Secretaries of HHS, Labor, and Treasury issued formal guidance regarding SBC.  *See* 77 Fed. Reg. 8,706 (Feb. 14, 2012).  This guidance incorporates several government-created documents that insurers are to use under PHSA § 2715, including an SBC Template and instructions for completing the SBC Template.  *See* Exs. 3-4 to Blue Cross's Mem. ISO Mot. to Dismiss (Dkt. 116-4-5).  Insurers are required to use the SBC Template.  *See* Ex. 4 to Blue Cross's Mem. ISO Mot. to Dismiss (Dkt. 116-5).

"hospital outpatient care." However, the terms "inpatient" and "outpatient" are not among those terms that must be included. *See id*. at § 300gg-15(g)(1-3); *see also id*. at § 300gg-15(b)(3)(A) ("The standards shall ensure that the [SBC] includes uniform definitions of standard insurance terms and medical terms (consistent with subsection (g)) so that consumers may compare health insurance coverage and understand the terms of coverage (or exception to such coverage)."). The Secretary of HHS is also directed to include definitions of "such other terms as the Secretary determines are important to define so that consumers may compare the medical benefits offered by health insurance and understand the extent of those medical benefits (or exceptions to those benefits)." *Id*. at § 300gg-15(g)(3). The Secretary's "standards shall ensure that the [SBC] is presented in a uniform format that does not exceed 4 pages in length and does not include print smaller than 12-point font." *Id*. at § 300gg-15(b)(1).

In general, the penalty for non-willful failures to abide by the provisions of the PHSA, including § 2715, is $100 per affected individual, per day of noncompliance, if a state has failed to enforce the rules. *See* 42 U.S.C. § 300gg-22(b)(2)(C)(i). Entities that willfully fail to provide the information required by § 2715 are "subject to a fine of not more than $1,000 for each such failure" and a "failure with respect to each enrollee shall constitute a separate offense" subject to a fine. 42 U.S.C. § 300gg-15(f).

2.   PHSA § 2715 Regulations

On February 14, 2012 (pursuant to PHSA § 2715), the Secretaries of HHS, Labor, and Treasury issued regulations governing SBCs and the "uniform glossary" contemplated by the statute ("SBC Regulations"). *See* 77 Fed. Reg. 8,668 (Feb. 14, 2012); *see also* 45 C.F.R. § 147.200 (titled "Summary of benefits and coverage and uniform glossary").[11] These SBC

---

[11] The SBC Regulations appear in identical fashion in three different titles of the Code of Federal Regulations – one for each agency: Title 26 (Treasury), Title 29 (Labor), and Title 45

Regulations state that SBCs must include "[u]niform definitions of standard insurance terms and medical terms so that consumers may compare health coverage and understand the terms of (or exceptions to) their coverage, in accordance with guidance as specified by the Secretary."  45 C.F.R. § 147.200(a)(2)(i)(A).  The SBC Regulations require SBCs to include an "Internet address for obtaining the uniform glossary, as described in paragraph (c) of" the regulations.  *See id*. at § 147.200(a)(2)(i)(M).  The uniform glossary contains definitions of the same terms identified in PHSA § 2715 (and more) – including "hospital outpatient care," but still not "inpatient" or "outpatient" – while, like § 2715, leaving room for "[s]uch other terms as the Secretary determines are important to define so that individuals and employers may compare and understand the terms of coverage and medical benefits (including any exceptions to those benefits) . . . ."  *See id*. at § 147.200(c)(2)(i-ii); *see also* Ex. 5 to Blue Cross's Mem. ISO Mot. to Dismiss (Dkt. 116-6) (titled "Glossary of Health Coverage and Medical Terms").  The uniform glossary's definitions are not created by health insurers; rather, they are "specified by the Secretary in guidance."  *Id*. at § 147.200(c)(2).  Further, the SBC Regulations mirror § 2715's provisions calling for a fine for a willful failure to provide the required information.  *See* 45 C.F.R. § 147.200(e).

### III.  <u>MOTION TO DISMISS STANDARD</u>

Federal Rule of Civil Procedure 12(b)(1) permits a challenge to the authority of the federal court to consider a dispute because "[f]ederal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *cf* Fed. R. Civ. P. 12(b)(1) (requiring dismissal of complaint where court lacks subject matter jurisdiction).  Thus, a court is "presumed to lack jurisdiction in a particular case unless the contrary affirmatively appears,"

---

(HHS).  *See* 26 C.F.R. § 54.9815-2715; 29 C.F.R. § 2590.715-2715; 45 C.F.R. § 147.200. Within his Amended Complaint, Mr. Norvell cites to the HHS version at 45 C.F.R. § 147.200.

*Stock W., Inc. v. Confederated Tribes of the Colville Reservation*, 873 F.2d 1221, 1225 (9th Cir.

1989), and the plaintiff bears the burden of establishing that such jurisdiction exists, *KVOS, Inc.*

*v. Associated Press*, 299 U.S. 269, 278 (1936).  When the issue of subject matter jurisdiction is

raised, it must be resolved before the Court may consider the merits of the plaintiff's claims.

*See, e.g.*, *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 430-31 (2007).

When a complaint fails "to state a claim upon which relief can be granted," dismissal is

appropriate pursuant to Federal Rule of Civil Procedure 12(b)(6).  A motion to dismiss under

Rule 12(b)(6) should be granted if a plaintiff fails to plead enough facts to "state a claim to relief

that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Zucco*

*Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 989 (9th Cir. 2009).

## IV.  REPORT

### A.      Mr. Norvell Lacks Standing

To possess standing to sue, a plaintiff must have (1) suffered an injury-in-fact, (2) that is

fairly traceable to the challenged conduct of the defendant, and (3) likely to be redressed by a

favorable judicial decision.  *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (*Spokeo*

*II*).  To establish injury-in-fact, "a plaintiff must show that he or she suffered 'an invasion of a

legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not

conjectural or hypothetical.'"  *Id*. at 1548 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560

(1992)).  To be considered "concrete," the injury "must be '*de facto*'; that is, it must actually

exist."  *Id*.  In other words, of significance here, a plaintiff "may not show an injury-in-fact

merely by pointing to a statutory cause of action."  *Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1113

(9th Cir. 2017) (*Spokeo III*); *see also Spokeo II*, 136 S. Ct. at 1549 ("Article III standing requires

a concrete injury even in the context of a statutory violation" and plaintiff therefore cannot

"allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-

fact requirement of Article III.").  Rather, a two-part test has evolved in the Ninth Circuit for

determining whether a plaintiff's alleged statutory violation constitutes a concrete injury-in-fact:

"(1) whether the statutory provisions at issue were established to protect [the plaintiff's] concrete

interests (as opposed to purely procedural rights), and if so, (2) whether the specific procedural

violations alleged in this case actually harm, or present a material risk of harm to, such interests."

*Spokeo III*, 867 F.3d at 113.[12]

Applying the holding of *Spokeo III* to Mr. Norvell's claims reveals that he has not

suffered the requisite injury-in-fact to support Article III standing.  In pertinent regard, Mr.

Norvell identifies his injury as an inability to compare FEHBA plans:

> Absent inpatient/outpatient definitions, I'm unable to project hospital care
> Copayments for any FEHBA plan, I'm unable to project the hospital care that
> would be covered by a BC Idaho plan, and I'm therefore unable to 'understand'
> these plans.  Being unable to understand the plans, I can't compare them.  Being
> unable to compare Non-Federal Defendants' available medical insurance plans, I'm
> unable to rationally choose the best one for my circumstances.  My circumstances
> include *vulnerability to* (a) another hospitalization and (b) the *nature of* harm that I
> endured from inpatient/outpatient categorization confusion relating to my heart
> surgery in 2013 . . . .  The[se] scenario[s] . . . constitute *my continuing injury*, upon
> which I base this complaint.

Am. Compl., ¶¶ 61-63 (Dkt. 105) (emphasis in original).[13]  He essentially argues that the

FEHBA and the PHSA require that he have enough information (that he feels is needed) to

compare health benefit plans; that he does not have such information; and that, by not having

that information, he has suffered "procedural injuries."  *Id*. at ¶¶ 66-67 ("My Continuing Injuries

are 'procedural injuries' . . . .  Procedural rights are created by statute and implicated by a federal

---

[12]  *Spokeo III* was decided after this Court's March 2, 2017 Order dismissing the case;
however, the Ninth Circuit remanded the action for further proceedings in light of *Spokeo III's*
possible application to standing challenges and/or estoppel/preclusion arguments.  *See supra*.

[13]  Mr. Norvell is careful to note that this action is *not* premised on the "harm" associated
with his efforts in getting the cost share of his 2013 heart ablation surgery reduced from $3,800
to $100.  *See* Am. Compl., ¶ 64 (Dkt. 105).

**REPORT AND RECOMMENDATION - 15**

agency's action or failure to act.  My procedural rights are accorded by 5 U.S.C. § 8907 and 42 U.S.C. § 300gg-15, which Congress enacted to protect my concrete interests.  *My continuing injury stems from invasions of those interests, in the form of information deprivation*.") (emphasis added, quotation marks, and citations omitted).  But, without more, these circumstances do not reflect a sufficiently concrete injury under *Spokeo III*.

Mr. Norvell is of a strong and certain opinion that he (and anyone else) needs more information than what currently exists to better compare FEHBA plans.  But to say that the FEHBA and the PHSA require the inclusion of the exact information he now seeks – so that he can completely and accurately predict at the time of enrollment the outcome of every coverage decision for various medical contingencies – goes too far.  The Court agrees that both statutes (alongside the SBC Regulations) exist in part to supply information to individuals eligible to enroll in a health benefits plan; indeed, to that end, they require the inclusion of certain information (relevant here, the definitions of certain insurance-related and medical terms) within SBC materials and the publicly-available uniform glossary.  *See supra*.  This information is (and always has been) provided and available to consumers like Mr. Norvell.  However, Mr. Norvell contends that must have definitions for "inpatient" and "outpatient" to legitimately compare health benefit plans, and the absence of this additional information amounts to a statutory violation manifesting in a concrete injury.

To be clear, *if* the FEHBA and the PHSA required that "inpatient" and "outpatient" be defined but were not, then Mr. Norvell's claim of a concrete injury would have more traction.  But, again, *there is no such requirement*.  And while the merits of Mr. Norvell's alleged-need for these definitions may fairly be debatable, he simply is not entitled to this information.  His standing argument therefore stumbles out of the gate, the *sine qua non* of an informational injury inquiry:  He seeks definitions that are not statutorily/regulatorily required to begin with and there

**REPORT AND RECOMMENDATION - 16**

is no common law cause of action that parallels the injury he claims (lack of information about insurance).  *See, e.g.*, *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 345 (4th Cir. 2017) ("A plaintiff suffers a concrete information injury where he is denied access to information required to be disclosed by statute, and he 'suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure.'") (quoting *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016) (citing *FEC v. Akins*, 524 U.S. 11, 20-25 (1998))).[14] Without being denied information that is required to be provided, there is no implicated concrete interest that can be harmed under *Spokeo III*.  To hold differently would expand the boundaries of informational standing and upend understood congressional directives.  *See* Blue Cross Reply ISO Mot. to Dismiss, p. 8 (Dkt. 148) ("If any individual could obtain a court order in their district requiring a carrier to add a defined term to an SBC, it would destroy the congressionally-mandated uniformity of SBCs, strip from the HHS Secretary his sole discretion to determine the definitions that must be included in the SBC, and subject the carriers to fines for including terms other than those provided to them by HHS.").  Hence, there is no injury-in-fact[15] that undergirds Mr. Norvell's standing.

---

[14]   The Court recognizes the space for arguing an informational injury via the absence of otherwise not-required terms, particularly when the Secretary of HHS is directed to include definitions of "such other terms as the Secretary determines are important to define so that consumers may compare the medical benefits offered by health insurance and understand the extent of those medical benefits (or exceptions to those benefits)."  42 U.S.C. § 300gg-15(g)(3); *see also* 45 C.F.R. § 147.200(c)(2)(ii).  Though not concluding as much here (*see supra*), this is especially so as against the Non-Federal Defendants/Insurers who have no authority to craft SBCs containing definitions to Mr. Norvell's satisfaction.  This reality necessarily draws on the additional traceability and redressability elements of a standing analysis as to these parties.

[15]   Assuming an informational injury, it still must be "imminent" and "not too speculative"; in other words, it must be "certainly impending."  *Lujan*, 504 U.S. at 564.  With these considerations in mind, the undersigned agrees with Judge Winmill's earlier ruling that Mr. Norvell's future harm is contingent on (1) remaining covered under a health benefit plan that does not define "inpatient" or "outpatient"; (2) has a procedure mischaracterized as "outpatient"; (3) as a result, is charged more; and (4) engages in the mandatory appeals process and is

**B.      Even If Mr. Norvell Had Standing, His Claims Should Be Dismissed for Failure to State a Claim**

1.      Mr. Norvell Has No Private Right of Action Against The Non-Federal Defendants[16]

Mr. Norvell brings claims against the Non-Federal Defendants only under PHSA § 2715 and its associated regulations.  *See supra*.  Realizing that he has no explicit private right of action under either PHSA § 2715 or its regulations, he argues instead that PHSA § 2715 allows for an *implied* private right of action to facilitate his claims against the Non-Federal Defendants.  *See* Pl.'s Resp. to Non-Fed. Defs.' MTD, pp. 15-18 (Dkt. 136).

In *Cort v. Ash*, 422 U.S. 66 (1975) and *Alexander v. Sandoval*, 532 U.S. 275 (2001), the Supreme Court provided guidance in analyzing whether a statute creates an implied private right of action.  *Cort* prescribes considering the following factors:

> First, is the plaintiff one of the class for whose especial benefit the statute was enacted – that is, does the statute create a federal right in favor of the plaintiff?  Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?  Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?  And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

---

unsuccessful in getting his cost share reduced.  *See Norvell I*, 2015 WL 5611588 at *4.  It is possible that none of these events will occur, let alone all of them, exposing only "conjectural harm for which standing is always denied."  *Id.* (citing *Bova v. City of Medford*, 564 F.3d 1093, 1097-98 (9th Cir. 2009)).

[16]  A private right of action does appear to exist against the Federal Defendants under the FEHBA.  *See* 5 U.S.C. § 8912 ("The district courts of the United States have original jurisdiction, concurrent with the United States Court of Federal Claims, of a civil action or claim against the United States founded on this chapter."); *see also* 5 C.F.R. § 890.107(c) ("A covered individual may seek judicial review of OPM's final action on the denial of a health benefits claim.  A legal action to review final action by OPM involving such denial of health benefits must be brought against OPM and not against the carrier or carrier's subcontractors."); *but see* Fed. Defs.' Reply ISO Mot. to Dismiss, pp. 3-4 (Dkt. 154) ("One sign that a statute was established to protect the concrete interests of individuals occurs when Congress provides a private right of action – but Mr. Norvell does not dispute that no such private right of action is available for the applicable statutes here.").

**REPORT AND RECOMMENDATION - 18**

*Cort*, 422 U.S. at 78 (internal quotation marks and citations omitted).  While the *Cort* factors remain relevant, the focus now is whether Congress "displays [through the statute] an intent to create not just a private right but also a private remedy." *Alexander*, 532 U.S. at 286-91. "Statutory intent [to create not just a private right but also a private remedy] is determinative"; without Congress's intent to create a remedy, no right of action can be implied. *Id.* at 286-87 ("The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy.  Statutory intent on this latter point is determinative.  Without it, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter."); *see also Segalman v. Southwest Airlines Co.*, 895 F.3d 1219, 1224 (9th Cir. 2018) (explaining that, after *Sandoval*, "we evaluate whether an implied private cause of action exists under a statute by imposing ordinary tools of statutory interpretation, and we are not 'constrained by the *Cort* framework.'") (quoting *Logan v. U.S. Bank Nat'l Ass'n*, 722 F.3d 1163, 1171 (9th Cir. 2013)).

In this reframed approach, courts do not strictly apply the four *Cort* factors (as advocated by Mr. Norvell), but instead "begin [the] search for congressional intent with the language and structure of the statute, and then look to legislative history only if the language is unclear, or if there is a clearly expressed contrary intention in the legislative history that may overcome the strong presumption that the statutory language represents congressional intent." *Segalman* 895 F.3d at 1224 (citing *Logan*, 722 F.3d at 1171).  As the Ninth Circuit in *Segalman* recently explained, "most relevant . . . with respect to statutory structure" is "*whether Congress designated a method of enforcement other than through private lawsuits, because '[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others.*'" *Segalman*, 895 F.3d at 1224 (quoting *Northstar Fin. Advisors, Inc. v. Schwab*

**REPORT AND RECOMMENDATION - 19**

*Invs.*, 615 F.3d 1106, 1115 (9th Cir. 2010)) (emphasis added). Therefore, the existence of an implied private right of action tracks the language and structure of the at-issue statute; if this demonstrates that Congress did not intend to create a private right of action, the court need not consider any additional factors. *Segalman*, 895 F.3d at 1224. Here, it cannot be said that Congress intended to create an implied private right of action to remedy violations of PHSA § 2715.

First, § 2715's focus is not on enrollees like Mr. Norvell, but on how the HHS Secretary should regulate insurers/carriers. *See, e.g.*, Am. Compl., ¶ 14 (Dkt. 105) (Mr. Norvell alleging: "Defendant Secretary, HHS heads the HHS and is responsible for identifying and adding terms to the Uniform Glossary [ ], 42 U.S.C. § 300gg-15(g), which must be provided for each insurance plan by its issuer or administrator. Further, the Defendant Secretary, HHS has sole responsibility for asserting the 42 U.S.C. § 300gg-15(f) in the case of willful failure to provide information as required by 42 U.S.C. § 300gg-15."); *see also id.* at ¶ 26 (same in regulatory context). "Statutes containing general proscriptions of activities *or focusing on the regulated party rather than the class of beneficiaries whose welfare Congress intended to further 'do[ ] not indicate an intent to provide for private rights of action.*" *Logan*, 722 F.3d at 1171 (quoting *Cal. v. Sierra Club*, 451 U.S. 287, 293 (1981)) (emphasis added).[17]

Second, and more telling, is PHSA § 2715's imposition of a "fine" against parties committing an "offense" under the statute. *See* 42 U.S.C. § 300gg-15(f) ($1,000 fine for willful

---

[17]  Relevant here, as appropriately pinpointed by Blue Cross, PHSA § 2715 focuses upon health plan enrollees and barely even references the regulated parties (insurers/carriers), such that the PHSA "is *two* steps removed from direct reference to the enrollees, because the statute is devoted to establishing requirements for a *government regulator* to monitor the regulated parties." Blue Cross's Mem. ISO Mot. to Dismiss, p. 15 (Dkt. 116-1) (citing 42 U.S.C. § 300gg-15(a) & (c) and noting that "[t]his language shows that Congress meant for the Secretary of HHS to enforce the law and that Congress had no intention of giving private parties a cause of action under the statute.") (emphasis in original).

violations); *see also* 45 C.F.R. § 147.200(e) (same); 42 U.S.C. § 300gg-22(b)(2)(C)(i) ($100 fine

for non-willful violations).  Such fines are imposed by the HHS (if not imposed by States as to

non-willful $100 fine).  *See* 45 C.F.R. § 147.200(e); 77 Fed. Reg. 8668, 8679 (Feb. 14, 2012);

*see also* 42 U.S.C. § 300gg-22(a)(2).  Using words like "fine" and "offense," coupled with the

fact that the above-referenced fines are imposed by a federal agency, demonstrates that the only

enforcing party envisioned by Congress is the government itself.  *See Segalman*, 895 F.3d at

1226 ("[A] statute's remedial scheme may foreclose a private cause of action even where the

scheme does not provide a method for aggrieved individuals to recover compensatory relief

otherwise. . . .  *Congress's express provision of certain remedies and enforcement methods –

administrative penalties, an agency cause of action to enjoin statutory violations, and criminal

penalties for willful violators – made it 'highly improbably that Congress absentmindedly forgot

to mention an intended private action.'*") (citing and quoting *Transamerica Mortg. Advisors, Inc.

v. Lewis*, 444 U.S. 11, 19-21 (1979)) (emphasis added).[18]  In sum, PHSA § 2715's statutory and

regulatory schemes establish a clear method of administrative regulation and enforcement for

any violations by the HHS, underscoring Congress's intent to preclude a private right of action.

---

[18]  Mr. Norvell acknowledges that Congress entrusted PHSA enforcement to HHS, but
counters that "[t]he reality of PHSA § 2715(b)(3) 'enforcement' must be considered in
determining whether Congress implies [his] private right to enforce[.]"  Pl.'s Resp. to Non-Fed.
Defs.' MTD, p. 21 (Dkt. 136); *see also id*. at pp. 22 & 25 (arguing that implied private right of
action exists despite PHSA's enforcement mechanisms because "the Secretary refuses to enforce
PHSA § 2715(b)(3)").  But *Segalman* rejected this conceptual end-run around the PHSA's
statutory and regulatory enforcement language.  *See Segalman*, 895 F.3d at 1227 ("We reject
Segalman's invitation to discount the ACAA remedial scheme on the ground that it is ineffectual
as a practical matter. . . .  *Segalman's argument falls short because DOT's limited enforcement
capabilities and efforts, however, concerning, do not shed light on Congress's intent when
setting out the ACAA remedial scheme.  Nor may we infer a private cause of action under a
statute simply because the agency tasked with enforcement does not live up to its mandate*.")
(emphasis added).  To his credit, Mr. Norvell admits to the "tension" between his arguments in
this respect and *Segalman*, before musing (in a manner reflecting the remarkable layperson's
knowledge and study of the law he has undertaken) about "concepts" reflected in *Marbury v.
Madison*, 5 U.S. 137 (1803).

**REPORT AND RECOMMENDATION - 21**

Finally, when Congress passed the ACA (creating PHSA § 2715), it created private remedies in *other* portions of the law – that is, Congress chose to provide an express private right of action to enforce provisions of the ACA, but did not do so for § 2715.  *See, e.g.*, 42 U.S.C. § 18116.  The creation of a remedy in one part of a statute signals strongly that there is no remedy in other parts that do not include similar remedial language since Congress clearly understands how to create (and likewise not create) a private remedy.  *See, e.g.*, *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 147 (1985) ("We are reluctant to tamper with an enforcement scheme crafted with such evident care as the one in ERISA. . . .  Where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it. . . .  The presumption that a remedy was deliberately omitted from a statute is strongest when Congress has enacted a comprehensive legislative scheme including an integrated system of procedures for enforcement.") (internal quotation marks and citations omitted).

These factors singularly and in combination establish that PHSA § 2715 and its regulations do not provide Mr. Norvell a private right of action against the Non-Federal Defendants.[19]

> 2.  Mr. Norvell's Claims Against the Federal Defendants Are Premised upon Decisions Committed to Agency Discretion

The Administrative Procedure Act ("APA") provides for broad judicial review of agency action:  "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702; *see also id*. at § 706(1), (2)(A),(D) ("[R]eviewing court shall compel

---

[19]  Additionally, Mr. Norvell's request for declaratory relief cannot give rise to a private right of action where none exists under PHSA § 2715.  *See Pickrell v. Sorin Grp. USA, Inc.*, 293 F. Supp. 3d 865, 869 (S.D. Iowa 2018) ("Declaratory Judgment Act does not create a substantive cause of action, and a declaratory judgment is improper where the underlying statute contains no private right of action.") (citing *Shilling v. Rogers*, 363 U.S. 666, 677 (1960)).

**REPORT AND RECOMMENDATION - 22**

agency action unlawfully withheld or unreasonably delayed; and hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . [or] without observance of procedure required by law."). Thus, as a general matter, the Supreme Court has consistently articulated "a 'strong presumption' favoring judicial review of administrative action." *Mach Mining, LLC v. EEOC*, 135 S. Ct. 1645, 1651 (2015) (quoting *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986)); *see also e.g.*, *Lincoln v. Vigil*, 508 U.S. 182, 190 (1993) ("[W]e have read the APA as embodying a 'basic presumption of judicial review.'") (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967)).

However, the APA also forecloses judicial review to the extent that "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). "This is a very narrow exception" that comes into play only "in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971) (internal quotation marks omitted); *see also Heckler v. Chaney*, 470 U.S. 821, 830 (1985) ("[R]eview is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion."). Because an agency's "[r]efusal to take enforcement steps" is "generally . . . precisely the opposite" of an agency's actions in accordance with "a statute that set[s] clear guidelines for [such actions]," the "presumption of reviewability" does not apply to that refusal. *Heckler*, 470 U.S. at 831. Indeed, "in that situation . . . the presumption is that judicial review is not available." *Id.* In other words, "an agency's decision *not* to take enforcement action should be presumed immune from judicial review under [5 U.S.C] § 701(a)(2)." *Id.* at 832;[20] *see also*

---

[20] *Heckler* set forth several reasons why agency enforcement decisions are generally not suitable for judicial review: (1) "an agency decision not to enforce often involves a complicated

*People for the Ethical Treatment of Animals, Inc. v. USDA*, 7 F. Supp. 3d 1, 10-11 (D.D.C. 2013) ("[A] classic example of action committed to agency discretion is an agency's decision whether or not to take an enforcement action.").

Here, the majority of Mr. Norvell's claims against the Federal Defendants (Claims for Relief 34-135) deal with HHS and CMS's alleged failure to levy fines against various entities under the PHSA.  There is no framework for the Court to assess the prudence, or imprudence, of the Federal Defendants' decisions not to levy the fines that Mr. Norvell contends must now be imposed.[21]  The text of PHSA § 2715 provides, in relevant part, that an entity which "willfully fails to provide the information required under this section *shall be subject to a fine* of not more than $1,000 for each such failure."  42 U.S.C. § 300gg-15(f) (emphasis added).  Such language demonstrates discretion by making a fine possible, but not mandatory.  *See* Fed. Defs.' Mem. ISO Mot. to Dismiss, p. 22 (Dkt. 121-1) (providing definitions to "subject to open" and "subject to liability").[22]  In this setting, other than Mr. Norvell's arguments surrounding his need for

---

balancing of a number of factors which are peculiarly within its expertise," such as allocation of resources and agency policies and priorities; (2) an agency is better equipped to make that balancing than a court; (3) an agency's refusal to enforce does not implicate personal liberty or property rights, which courts are often called on to protect; and (4) an agency's decision not to enforce is analogous to prosecutorial discretion, an arena in which courts have traditionally not interfered.  *Heckler*, 470 U.S. at 831-32.  Even so, *Heckler* went on to clarify that the presumption of unreviewability vis à vis non-enforcement decisions is rebuttable "where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers."  *Id.* at 832-33.

[21]  Mr. Norvell claims that "common sense" supplies the yardstick for such assessments. *See* Pl.'s Resp. to Fed. Defs.' Mot. to Dismiss, p. 21 (Dkt. 144) ("I contend that only a basic measure of common-sense need be employed to determine the appropriateness and necessity of fines regarding Claims 35-135.  No 'special expertise' needed.").  This is necessarily a subjective standard incapable of any actual replicable guidance.

[22]  Without a statute or regulation specifically commanding the imposition of fines, a remedy under 5 U.S.C. § 706(1) is also arguably lacking.  *See Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 932 (9th Cir. 2010) (noting that Supreme Court's requirement that "the purportedly withheld action [be] . . . 'legally required' – in the sense that the agency's

certain definitions and the deficiencies with maintaining the *status quo* moving forward, *see, e.g.*, Pl.'s Resp. to Fed. Defs.' Mot. to Dismiss, p. 19 (Dkt. 144), there is no basis to conclude (in fact no real evidence at all) that either HHS or CMS has "'consciously and expressly adopted a general policy' that is so extreme as to amount to an abdication of [their] statutory responsibilities." *Heckler*, 470 U.S. at 833, n.4 (quoting *Adams v. Richardson*, 480 F.2d 1159 (1973)).

Even if one were to presume a PHSA § 2715 violation, the decision of whether to issue a fine remains committed to agency discretion and therefore is not subject to judicial review. *See Heckler*, 470 U.S. at 831-32 ("An agency generally cannot act against each technical violation of the statute it is charged with enforcing.  The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities.  Similar concerns animate the principles of administrative law that courts generally will defer to an agency's construction of the statute it is charged with implementing, and the procedures it adopts for implementing that statute.") (citing *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 543 (1978); *Train v. Nat. Res. Def. Council, Inc.*, 421 U.S. 60, 87 (1975)).

Actions committed to agency discretion under 5 USC § 701(a)(2) are not limited to decisions of whether to enforce; they also apply here to Mr. Norvell's claims that (1) HHS wrongfully failed to define "inpatient" in the uniform glossary under 45 C.F.R. § 147.200(c)(2)(ii) (Claims for Relief 1-2), and (2) OPM wrongfully failed to require various FEHBA plans to define the word "inpatient" in their plan brochures under 5 U.S.C. §§ 8902(d), 8907(a), (b) (Claims for Relief 3-10 and 12-15).

---

legal obligation is so clearly set forth that it could traditionally have been enforced through a writ of mandamus.") (quoting *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004)).

**REPORT AND RECOMMENDATION - 25**

The uniform glossary must contain "uniform definitions, specified by the Secretary in guidance" of 44 specified health-coverage terms.  45 C.F.R. § 147.200(c)(2).  Definitions for each of these terms are provided.  Then, the uniform glossary is to contain *"[s]uch other terms as the Secretary determines are important to define* so that individuals and employers may compare and understand the terms of coverage and medical benefits (including any exceptions to those benefits), as specified in guidance."  45 C.F.R. § 147.200(c)(2)(ii) (emphasis added).  The term "inpatient" is not among the 44 listed as requiring a definition; instead, the choice of which, if any, additional terms to define is left entirely to the Secretary's discretion – that is, terms the Secretary "determines are important to define."  *See, e.g.*, *Bilsom Intern., Inc. v. E.P.A.*, 1990 WL 183563, at *2 (D.D.C. 1990) (finding that "there is no cause of action under the APA" where statute directs that agency head [(EPA administrator)] "may issue an order specifying such relief as he determines is necessary to protect the public health and welfare"); *see also San Bernardino Mountains Community Hosp. v. Secretary of Health & Human Servs.*, 63 F.3d 882, 886-87 (9th Cir. 1995) (holding that inclusion of phrase "as determined by the Secretary" in Medicare Act's definition of "sole community hospital" "make[s] clear that Congress intended to delegate to the Secretary the task of outlining and defining the criteria for attaining sole community hospital status").

OPM's requirements for FEHBA plan documents contain similar assignments to agency discretion.  For example:

- 5 U.S.C. § 8902(d):  "Each contract under this chapter shall contain a detailed statement of benefits offered and shall include such maximums, limitations, exclusions, and other definitions of benefits *as the Office considers necessary or desirable*."  5 U.S.C. § 8902(d) (emphasis added);

- 5 U.S.C. § 8907(a):  "[OPM] shall make available to each individual eligible to enroll in a health benefits plan under this chapter such information, in a form acceptable to the [OPM] after consultation with the carrier, *as may be necessary* to enable the individual to exercise an informed choice among

the types of plans described by sections 8903 and 8903a of this title."  5 U.S.C. § 8907(a) (emphasis added); and

- 5 U.S.C. § 8907(b):  "Each enrollee in a health benefits plan shall be issued *an appropriate document setting forth or summarizing* the services or benefits, including maximums, limitations, and exclusions, to which the enrollee or the enrollee and any eligible family members are untitled thereunder; procedure for obtaining benefits; and *principal provisions* of the plan affecting the enrollee and any eligible family members."  5 U.S.C. § 8907(b) (emphasis added).

This language gives OPM the discretion to determine the definitions, details, and explanations, while working cooperatively with carriers to provide the information necessary to help individuals choose between the types of provided plans.  It does not, as Mr. Norvell implies is the case, *absolutely require* that his preferred definitions be supplied.  *See* Pl.'s Resp. to Fed. Defs.' Mot. to Dismiss, p. 30 (Dkt. 144) ("The Federal Defendants' contention to the contrary – that OPM had a choice of whether to define the term "inpatient" under the circumstances – defies common-sense, and the Federal Defendants thus fail to satisfy the first condition, being choice. *Simply stated, the Federal Defendants have no choice but to define the term that dictates Copayments.*") (emphasis added).

Across these additional claims, the relevant statutory provisions commit the challenged agency action to that agency's discretion.  Such a choice is appropriate because – just as with decisions to (or not to) assess a fine – HHS and OPM's selection of which terms to (1) include within the uniform glossary, and to (2) require the plans to define, calls for unique agency expertise while balancing the competing considerations of informing consumers all the while keeping plan documents simple and readable.  Also consistent with enforcement decisions, there are no meaningful guidelines against which the exercise of discretion by HHS and OPM in these respects can be measured and critiqued.  *See Heckler*, 470 U.S. at 830.  Again, "common-sense" (at least as understood, defined, and applied by Mr. Norvell (*see, e.g.*, Am. Compl, p. 76-77, 79-

**REPORT AND RECOMMENDATION - 27**

80, 82-83 (Dkt. 144)) is an insufficient template for judging either HHS or OPM's exercise of discretion.[23]

When unfolded in such a manner and laid down against the applicable law, it is inescapable that Mr. Norvell's various claims against the Federal Defendants should be separately dismissed for failure to state a claim.  Agency decisions not to levy fines are the paradigmatic example of enforcement decisions committed to agency discretion; moreover, the selection of additional terms to include in the uniform glossary, as well as the decision not to require various FEHBA plans to define "inpatient" in their materials, are committed to agency discretion.

## V.  RECOMMENDATION[24]

Based on the foregoing, IT IS HEREBY RECOMMENED that:

1.    Defendants Blue Cross of Idaho Health Service Inc. ("BCI"), Blue Cross and Blue Shield Association ("BCBSA"), and Special Agent Mutual Benefit Association's ("SAMBA") (collectively "Blue Cross") Motion to Dismiss Plaintiff's Amended Complaint (Dkt. 116) be GRANTED;

---

[23]  As before, the lack of a statute or regulation requiring the inclusion of "inpatient" within the uniform glossary or plan materials upends Mr. Norvell's failure to act claims under 5 U.S.C. § 706(1).  *See supra* (citing *Norton*, 542 U.S. at 63).  To be clear, had the HHS not produced a uniform glossary and/or not defined any terms at all, actions under 5 U.S.C. § 706(a) may have been appropriate; that HHS and OPM may not have acted in the precise way preferred by Mr. Norvell is not enough.

[24]  Mr. Norvell, it would appear, has spent countless hours researching the complex statutory and regulatory world of health insurance coverage.  He raises concerns that give understandable pause to the reader, in that he suggests that there has been possibly deliberate and coordinated mischaracterization of the nature of hospital care to benefit insurers at the expense of insureds.  Whether such concerns are well-founded or whether they are illusory is not a question that the Court should answer for the reasons described in this Report and Recommendation. Under the existing  statutory and regulatory framework involved, if there is an avenue to address those concerns, it is found somewhere other than this Court.

**REPORT AND RECOMMENDATION - 28**

2.      Defendants Claim Administration Corporation ("CAC") and First Health Life and Health Insurance Company's ("FHLH") Motion to Dismiss Plaintiff's Second Amended Complaint (Dkt. 117) be GRANTED;

3.      Defendants Office of Personnel Management ("OPM), the Director of OPM, the Department of Health and Human Services ("HHS"), the Secretary of HHS, and the Centers for Medicare & Medicaid Services' ("CMS") (collectively "Federal Defendants") Motion to Dismiss (Dkt. 121) be GRANTED; and

4.      Cigna Health and Life Insurance Company's ("Cigna") Motion to Dismiss (Dkt. 127) be GRANTED.

Pursuant to District of Idaho Local Civil Rule 72.1(b)(2), a party objecting to a Magistrate Judge's recommended disposition "must serve and file specific, written objections, not to exceed twenty pages . . . within fourteen (14) days . . ., unless the magistrate or district judge sets a different time period."  Additionally, the other party "may serve and file a response, not exceed ten pages, to another party's objections within fourteen (14) days after being served with a copy thereof."

DATED: July 16, 2019

Ronald E. Bush
Chief U.S. Magistrate Judge